UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

          – *against* –

HERZEL MEIRI and AMIR MEIRI,

                              Defendants.

---

PETERMARK II LLC, ADVILL
CAPITAL LLC, VINCENT
HOLMES, SAMUEL NYAMEKYE,
and NYAMEKYE HOLDING CORP.,

                    Third-Party
                    Petitioners.

(Re: Specific Properties: 644 Chauncey
Street, Brooklyn, New York, Asset ID: 18-
FBI-003286; 2146-2148 Fulton Street,
Brooklyn, New York, Asset ID: 18-FBI-
0032875)

**OPINION & ORDER**

15 Cr. 627 (ER)

---

Ramos, D.J.:

        This forfeiture proceeding stems from an expansive criminal scheme to defraud

vulnerable New York City residents out of their homes or other properties.  From around

January 2013 to May 2015, Herzel and Amir Meiri, along with five other defendants,

operated an organization known as "Homeowner Assistance Services of New York"

(HASNY).  The defendants targeted owners of distressed properties, inviting them to seek

HASNY's assistance to save their homes from foreclosure.  Under the pretense of a loan

modification or a short sale, the defendants then tricked the victims into transferring their

properties to one of the defendants' entities.  The defendants generated millions of dollars

in profits through this fraudulent enterprise.

The scheme eventually came undone, and criminal proceedings were initiated. The Meiris pled guilty to conspiracy to commit wire fraud and bank fraud, and they agreed to forfeit more than thirty properties to the United States. Two of those properties, both located in Brooklyn, are at issue here. The first is 2146 and 2148 Fulton Street, which the defendants stole from Mary and Samuel Nyamekye. The second is 644 Chauncey Street, which the defendants stole from Olive and Vincent Holmes.

After stealing those properties, the Meiris used them as collateral to secure loans from Petermark II LLC and Advill Capital LLC. Petermark and Advill have filed third-party petitions asserting an interest in the forfeited properties. The companies maintain that they made the loans without actual or constructive knowledge of the Meiris' fraud. The United States, however, contends that Petermark and Advill were on notice of the fraud due to numerous red flags. Mr. Nyamekye and Mr. Holmes have filed third-party petitions as well.

On June 4 and 14, 2024, the Court held a hearing to adjudicate the parties' interests in the properties. Five witnesses testified: (1) Mitchel Guberman, the title closer for the Fulton Street loan; (2) Theresa Garelli, Petermark's expert for the Fulton Street loan; (3) Kenneth Warner, Petermark and Advill's expert for the Chauncey Street loan; (4) Mark Pnini, a principal of Petermark and Advill; and (5) David Reiss, Mr. Holmes's expert. Testimony from Mr. Nyamekye and Mr. Holmes was presented by affidavit. Each party also submitted several supporting exhibits.

Having considered all this evidence, the Court concludes that Petermark and Advill have failed to demonstrate, as the criminal forfeiture statute requires, that they were bona fide purchasers reasonably without cause to believe the properties were subject to forfeiture. The record shows that Petermark and Advill should have investigated the underlying fraud based on the conspicuous red flags that characterized their transactions with the Meiris. The Petermark and Advill petitions are therefore DENIED. The Nyamekye and Holmes petitions are GRANTED.

I.      **BACKGROUND**

A.  **Petermark and Advill**

This case revolves around the lending practices of Mark Pnini and his companies, Petermark and Advill. Pnini describes himself as a "hard money lender," meaning "an asset based lender that lends to investors on real estate property and properties collateralized by a loan." Tr. 202. A hard money lender focuses on the value of the property used as collateral rather than on the creditworthiness of the borrower. Tr. 309–10. Hard money loans are typically short-term loans with high interest rates and high fees. Tr. 202–03, 310. Pnini has engaged in hard money lending for over a decade and has made more than 100 loans. Tr. 202, 259.

Pnini met Herzel and Amir Meiri in October 2014. Tr. 203–04. He conducted three transactions with the Meiris. First, on October 22, 2014, Advill loaned $1.1 million to Launch Development LLC, a corporate entity controlled by the Meiris. Doc. 978-7. The loan was secured by a mortgage on three Brooklyn properties not at issue here: (i) 577 Madison Street, (ii) 127 Herkimer Street, and (iii) 1503 Bushwick Avenue. *Id.*; *see* Tr. 203–04.

The Madison Street property was encumbered by a UCC-1 fixture filing, which Launch Development had filed in April 2013. Doc. 979-1. A UCC-1 fixture filing secures a creditor's interest in items that are attached to the property. *See* Tr. 316 ("[I]f you provide goods and services to a property, and you want to have a security interest in those fixtures, you would file a UCC-1 to indicate you're a secured party relating to those fixtures on the property."). Such a filing creates "a cloud on title . . . that's effectively under the control of the person who filed it." Tr. 317. A contractor might file a legitimate UCC-1 lien identifying the specific fixtures that it installed. Tr. 316. The filing on the Madison Street property, however, described the collateral in generic terms encompassing

3

nearly any conceivable fixture. Doc. 979-1 at 4.[1] A UCC-3 statement—which terminates a UCC-1 filing, Tr. 346—was not filed on the Madison Street property until December 2015, more than a year after the loan closed. Doc. 979-2.

Launch Development made payments to Advill on this initial loan in December 2014, January 2015, and February 2015. Tr. 205–06; *see* Doc. 977-6. The loan was eventually paid in full. Tr. 206.

Pnini made two subsequent loans to entities affiliated with the Meiris. Those loans were secured by the Fulton Street and Chauncey Street properties at issue in this forfeiture proceeding.

### B. The Fulton Street Property

In June 1989, Samuel Nyamekye purchased 2146 and 2148 Fulton Street. Doc. 962 ¶ 3. The two lots are attached, Doc. 962-2 at 630, and the Court refers to them collectively as "the Fulton Street property." Mr. Nyamekye and his wife, Mary Nyamekye, used the front of one lot as a hardware store and the other as a warehouse. *Id.* Two apartments sat on top of each lot. *Id.*

The property sustained extensive fire damage in 2008. *Id.* at 634; Doc. 962 ¶ 4. In September 2010, while rebuilding, Mr. Nyamekye transferred title to both lots to

---

[1] The exact description of the collateral was as follows:

> All property which is so attached to the land or the improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control. Systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers, and other appliances. Light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools, and exercise equipment.

Doc. 979-1 at 4. The defendants often filed these fraudulent UCC-1 liens on properties to prevent homeowners from backing out of short sales. Doc. 979-5 at 433–35.

Nyamekye Holding Corp.  Doc. 962 ¶¶ 5–6; *see* Doc. 981-3.  As the Nyamekyes worked to repair the fire damage, they sought financing to help cover expenses.  Doc. 962 ¶ 7.  In April 2011, the couple borrowed $300,000 from Manors Pride Holding Corp.  *Id.* ¶ 8.  That loan was secured by a mortgage on the Fulton Street property.  Doc. 981-4.  Following construction setbacks, the Nyamekyes defaulted on the loan.  Doc. 962 ¶ 9.  Manors Pride foreclosed on the property in February 2012.  *Id.* ¶ 10; *see* Doc. 981-5 at 1.  In January 2014, a New York state court entered a judgment of foreclosure and sale in favor of Manors Pride.  Doc. 981-5.

 1. *The Theft*

 After the judgment of foreclosure was entered, Mrs. Nyamekye was contacted by a representative from HASNY.  Doc. 962 ¶ 11.  The representative offered to help the Nyamekyes keep the property.  Doc. 962-2 at 639–40.  The Nyamekyes visited the HASNY office on Hillside Avenue in Queens, where HASNY employees assured the couple that they could save the property from foreclosure.  Doc. 962 ¶¶ 13–15.  They instructed Mr. Nyamekye to sign various documents that were supposed to allow HASNY to negotiate with Manors Pride and obtain a bank loan for the Nyamekyes.  Doc. 962-2 at 651–56.

 Mr. Nyamekye signed two deeds.  First, on June 30, 2014, he signed a deed conveying 2148 Fulton Street to Launch for $1,000.  Doc. 981-6.  Launch recorded the deed on July 21, 2014.  *Id.*  On August 25, 2014, Mr. Nyamekye signed another deed conveying 2146 Fulton Street to Launch for $1,000.  Doc. 981-10.  Launch recorded that deed on October 9, 2014.  *Id.*  Both deeds were notarized by Samantha Boubert (who would later plead guilty to conspiracy to commit bank fraud, *see* Doc. 280 at 3–4).  Docs. 981-6, 981-10.[2]

---

[2] HASNY's name and its Hillside Avenue address appeared in the "presenter" and "return to" fields on the deeds transferring the Fulton Street property from Nyamekye Holding to Launch.  Docs. 981-6, 981-10.  The "presenter" is the person or entity that submits the document to the city register for recording.  Tr. 199.

Months after the transactions, the Nyamekyes learned that HASNY had in fact stolen the property. Doc. 962 ¶ 16. Meanwhile, on July 9, 2014, Launch paid $472,156.97 to satisfy the Manors Pride mortgage. Doc. 981-9. The mortgage was recorded as satisfied on September 23, 2014. Doc. 981-11.

*2. The Loan*

Having stolen the Fulton Street property from the Nyamekyes, the Meiris sought to use it as collateral. They approached Pnini about a second loan. Tr. 207. On February 26, 2015, Petermark loaned Launch Development $700,000 secured by a mortgage on the Fulton Street property. Docs. 981-12, 981-13.

Before he made the loan, Pnini met with the Meiris at their Hillside Avenue office, which he visited "[o]nce or twice." Tr. 212, 217. The office had a large sign outside— and another sign inside—that read "Homeowner Assistance Services of New York." Docs. 691-3, 691-4. When asked what he thought "Homeowner Assistance Services" was, Pnini testified that he "wouldn't even acknowledge the sign." Tr. 218. According to Pnini, he had no knowledge of the Meiris' criminal activity, and he did not inquire into their line of business or how they would use the money he loaned them. Tr. 212, 216, 220. Nor did Pnini order a credit report for the Meiris, as it was "not part of [his] practice." Tr. 207. Instead, Pnini explained, his "number one priority" is having "great collateral against a loan amount." *Id.*; *see also* Tr. 224 ("I'm not relying on the person's credit. I'm not relying on the person's word. I'm relying on the asset of the property as my collateral."). He asserted that before making the loan, "I did do my full research." Tr. 208.

Pnini's testimony about what his "full research" entailed was not replete with detail. He began by stating: "I evaluated the property in my own way of analyzing and I established a value in my mind of what I think it's worth, and I then come to a

---

The "return to" field lists the person or entity to whom the recorder is instructed to return the original document after recording. *Id.*

negotiation." *Id.* Pushed for more specifics, Pnini continued: "This is what I do for a living. . . . I would like to think I have a good knowledge of value. And between internet searches and probably drive by and see and inspecting the property, I established that I felt that the value was there." *Id.* Pnini could not recall any particular internet searches he did, but his general practice was to visit websites such as Zillow, Google Maps, Property Shark, and Trulia to determine a property's value. *Id.* at 208–09.

Along with his own "research," Pnini said he relied on his title company's representation that he would have clear title to the Fulton Street property. Tr. 224. Before a title company issues an insurance policy to a lender, it searches public records to examine the title for liens, encumbrances, and defects. Tr. 173–74. The title company then prepares a report showing the status of title. Tr. 174; *see also* Tr. 306–07 (noting that a title report provides "a breadth of understanding about what liens and encumbrances, financial and nonfinancial, . . . may [a]ffect [a] parcel of property"). Once the report has been prepared, the title company works with the parties to clear any issues or "exceptions." Tr. 174. At closing, the title closer provides a markup of the title report indicating which exceptions have been cleared or "omitted." *Id.* If an exception is omitted, that issue becomes part of the insurance policy, and the title company will defend it if litigation arises. Tr. 380. Pnini testified that he does not personally examine title reports, but his attorneys review the documents on behalf of Petermark and Advill. Tr. 272. Pnini repeatedly emphasized that he would not make a loan on a property unless he had first lien position. Tr. 246–49, 253.

Old Republic National Title Insurance Company prepared a title report before the Fulton Street loan closed. Doc. 982-1 at 30. Mitchel Guberman was the title closer. Tr. 29. The title closer represents the agent (in this case, Knickerbocker Abstract), who signs the insurance policy on behalf of the underwriter (Old Republic). Tr. 31–32. As of February 2015, Guberman had been a title closer for over twenty-five years and had done thousands of closings. Tr. 31.

As part of the title search, Knickerbocker ran a "Patriot search"—whose name alludes to the USA PATRIOT Act—on Launch Development.  Tr. 37, 112; *see* Doc. 982-3 at 12.  A Patriot search reviews the list of "designated nationals and blocked persons" maintained by the Treasury Department's Office of Foreign Assets Control.  Doc. 982-3 at 12 (capitalization omitted); *see* Tr. 350–51.  If the name being searched appears on that list, the federal government must be alerted to the transaction before it can proceed.  Tr. 111–12.  Knickerbocker's Patriot search did not return any results for Launch Development.  Doc. 982-3 at 12.

The title report did show outstanding property charges.  For the Fulton Street property, over $90,000 was escrowed to cover Environmental Control Board violations, unpaid taxes, water and sewer charges, and a sidewalk lien.  Doc. 982-2 at 1; *see* Tr. 160.  Those charges were listed among other "borrower's charges" to be paid to Knickerbocker.  Doc. 982-2 at 1; *see* Tr. 160.  Pnini asserted that such property charges are "irrelevant" to him because they are settled at closing before he issues the loan.  Tr. 234.

The title report listed several other potential exceptions to coverage, including three "no consideration" deeds dated September 2010, June 2014, and August 2014.  Doc. 982-1 at 38; *see* Docs. 981-3, 981-6, 981-10.  The September 2010 deed was the no consideration transfer of the Fulton Street property from Mr. Nyamekye to Nyamekye Holding.  Doc. 981-3.  The June and August 2014 deeds were the transfers of 2146 and 2148 Fulton Street to Launch for $1,000 apiece.  Docs. 981-6, 981-10.

As noted above, 2146 and 2148 Fulton Street are attached.  The September 2010 deed conveyed the lots together; the description of the property listed both "Lot 52" and "Lot 53."  Doc. 981-3 at 3.  The June and August 2014 deeds purported to effect two separate transfers of the two attached lots.  Doc. 981-6 (conveying 2148 Fulton Street); Doc. 981-10 (conveying 2146 Fulton Street).  But the two deeds used identical language to describe the metes and bounds of the individual lots.  Doc. 981-6 at 3; Doc. 981-10 at

3.  In other words, the deeds suggested that Nyamekye Holding conveyed the exact same physical location to Launch in both June 2014 and August 2014.

Guberman placed $7,500 of the loan proceeds in escrow pending Launch's delivery of affidavits explaining the no consideration deeds.  Tr. 39, 62; *see* Doc. 982-2 at 3.  Since the title company did not have the affidavits at closing, the company's clearance officer directed Guberman to hold the money in escrow until the affidavits were submitted.  Tr. 34.  And "everyone at the closing," including Petermark's attorney, "would have understood that the title company required [Guberman] to hold certain funds."  Tr. 62–63.

The loan closed on February 26, 2015.  Launch Development signed a promissory note for $700,000, Doc. 981-13, and the Meiris signed personal guaranties of the note, Doc. 983-1.  After closing, Knickerbocker received three affidavits related to the no consideration deeds.  Tr. 39; *see* Doc. 982-2 at 5–7.  The affidavits were dated March 4, 2015.  Doc. 982-2 at 5–7.  They were signed by Mr. Nyamekye and notarized by Samantha Boubert.  *Id.*

The affidavits had several peculiarities.  The first affidavit concerned the June 2014 transfer of 2148 Fulton Street from Nyamekye Holding to Launch.  *Id.* at 5.  It stated that Mr. Nyamekye, as president of Nyamekye Holding, "conveyed the subject premises for $1,000.00 and subject to the existing mortgages in 'as is' condition."  *Id.* (capitalization omitted).  At the time, however, there was no "existing mortgage":  the Manors Pride mortgage had been paid in full in July 2014, almost a year before the affidavit was signed.  Doc. 981-9.  The second affidavit addressed the August 2014 transfer of 2146 Fulton Street from Nyamekye Holding to Launch, and it provided an identical explanation—including the reference to "existing mortgages"—for the transaction.  Doc. 982-2 at 6.

The third affidavit raised additional questions.  Confusingly, it stated that Mr. Nyamekye had conveyed 2146 Fulton Street to Launch in August 2014 for no

consideration. *Id.* at 7. That was plainly inconsistent with the second affidavit, which stated that 2146 Fulton Street was conveyed to Launch for $1,000. The explanation for the transfer did not make sense either. Mr. Nyamekye stated: "I conveyed the subject premises to my corporation to change the form of ownership." *Id.* (capitalization omitted). But Launch Development—the grantee listed—was not Mr. Nyamekye's corporation, as other documents indicated. *Id.* at 30–35. And if the affidavit was supposed to address the no consideration transfer from Mr. Nyamekye to Nyamekye Holding in September 2010, it got both the date and the grantee wrong by stating that the property was transferred from Mr. Nyamekye to Launch in August 2014.

Despite these issues, the Petermark mortgage was recorded on March 10, 2015. Doc. 981-12.

### 3. *The Quiet Title Action*

In June 2015—soon after the initial criminal complaint in this case was filed—Nyamekye Holding brought a quiet title action against Launch in New York state court. Doc. 758-1 at 2. Nyamekye Holding alleged that Launch had defrauded it into signing over title to the Fulton Street property. *Id.*

Petermark intervened in the action, answered, and eventually moved for summary judgment to dismiss the complaint as to itself. *Id.* at 4, 7. The company argued that it was a bona fide encumbrancer for value because it had "loaned $700,000 to Launch in good faith, for valuable consideration, and without notice of the alleged fraudulent conduct of Launch." *Id.* at 7. In opposition, Nyamekye Holding filed an attorney affirmation "generally asserting that several material issues of fact preclude summary judgment." *Id.* at 9.

In a November 2020 opinion, the state court concluded that Petermark was a bona fide encumbrancer because it had granted Launch a mortgage on the property without constructive or actual notice of Launch's alleged fraud. *Id.* at 11. The court found that there was "no evidence to suggest that Petermark possessed any facts that would have

excited the suspicion of an ordinarily prudent person." *Id.* The court held that the attorney affirmation submitted by Nyamekye Holding lacked any evidentiary value and was insufficient to raise an issue of fact. *Id.* at 11–12. Accordingly, the court dismissed the complaint as to Petermark. *Id.* at 12.

### C. The Chauncey Street Property

The second property at issue here is a home at 644 Chauncey Street. Olive and Vincent Holmes purchased the property with a mortgage loan in 1997. Doc. 978-2 ¶ 1.

#### 1. The Theft

In 2013, the Holmeses began to fall behind on their monthly mortgage payments. *Id.* ¶ 5. Around that time, a HASNY representative called Mr. Holmes and told him that HASNY dealt with such issues. *Id.* ¶ 8. The Holmeses then met with Mario Alvarenga—another defendant in the criminal case—and other members of HASNY at the organization's office. *Id.* ¶ 10. Alvarenga said HASNY could help lower the Holmeses' monthly mortgage payments, and he advised them not to make those payments while HASNY negotiated with the bank. *Id.*

The Holmeses followed Alvarenga's instructions and stopped making their mortgage payments. *Id.* ¶ 11. They also provided HASNY with financial documents such as utility bills and tax returns. *Id.* And the Holmeses signed various papers at the HASNY office. *Id.* ¶¶ 12–13. Mr. Holmes has a third-grade education and is not able to read. *Id.* ¶ 4. Mrs. Holmes, who passed away in 2018, was legally blind. *Id.* ¶¶ 4, 29. While they could not read the documents they signed, the Holmeses believed that Alvarenga needed the documents to lower their mortgage payments. *Id.* ¶ 13.

Mr. Holmes later discovered that those documents had in fact transferred title to their home to Martin Development & Management, LLC, another entity controlled by the Meiris. *Id.* ¶ 15. The deed conveying the property to Martin Development was dated September 12, 2014. Doc. 976-1. Three days later, Martin Development paid off the outstanding mortgage, which belonged at that point to Beneficial Homeowner Service

Corporation.  Doc. 978-2 ¶ 15; *see* Doc. 976-4.  The mortgage was recorded as satisfied in September 2016.  Doc. 976-5.

    *2.  The Loan*

    After the theft, the Meiris approached Pnini about another loan.  Tr. 214.  On March 11, 2015, Petermark and Advill loaned $800,000 to Martin Development and two other Meiri entities:  UUA, LLC, and Horatio Management LLC.  Doc. 976-6.  The loan was secured by a mortgage on 644 Chauncey Street and two additional Brooklyn properties:  (i) 956 Montgomery Street and (ii) 307 East 26th Street.  *Id.*  The same parties—plus Launch Development—agreed to include the Fulton Street property in the mortgage as well.  Doc. 805-1.[3]

    Pnini could not recall whether he visited the Chauncey Street property prior to making the loan.  Tr. 239.  But he asserted that "at some point I must have done some form of due diligence to create a value in my own business mind."  *Id.*  Again, Old Republic prepared a title report before the loan closed.  Doc. 979-6.  As with the Fulton Street title report, Pnini did not review the report himself but relied on the title company and his attorneys to ensure clear title.  Tr. 244–45.

    The list of potential exceptions in the title report indicated that Launch had filed two UCC-1 financing statements on the East 26th Street property in March 2013.  Doc. 979-6 at 10; *see* Doc. 979-3.  The statements were prepared on March 5 and March 6, and they were classified as fixture filings.  Doc. 979-3 at 2, 7.  Like the Madison Street filings discussed above, both UCC-1 filings on the East 26th Street property described the collateral in expansive language rather than identifying a specific fixture.  Docs. 979-3 at 5, 10.  According to the title report, the UCC-1 filings were "being investigated," and there would be a "UCC-3 to follow."  Doc. 979-6 at 10 (capitalization omitted).  On

---

[3] Although this March 2015 loan involved multiple properties, the Court refers to it as "the Chauncey Street loan" or "the Chauncey Street transaction" for convenience.

March 17, almost a week after the loan closed, two UCC-3 statements terminating the UCC-1 statements were filed.  Doc. 979-4.

Like its Fulton Street counterpart, the title report also revealed various outstanding property charges, including prior judgments, numerous Environmental Control Board violations, and a sidewalk lien.  Doc. 979-6 at 10; *see* Tr. 324–25.  Several of those outstanding charges related to prior owners of the properties.  Doc. 979-6 at 10; *see* Tr. 325.

Along with the UCC-1 statements and property charges, the title report included an exception for "[r]ights of tenants or parties in possession, if any."  Doc. 979-6 at 9. When asked whether the presence of tenants or squatters in a building would affect his decision to make a loan, Pnini testified:

> [Y]ou can't rely on whether there's squatters or tenants or paying tenants.  You have to do the best you can to lend the lowest at the most amount—getting the greatest amount of loan to value as you possibly can taking into consideration that those people can be squatters, or tenants move into the building and eventually become squatters after you make the loan.

Tr. 236.  As a result, Pnini would "[n]ot really" consider whether a property was occupied before making a loan.  Tr. 237.  Pnini could not recall whether he asked the Meiris if the Chauncey Street property was occupied or requested any verification of tenancy.  Tr. 239.

The loan closed on March 11, 2015.  Doc. 976-6.  Again, the Meiris personally guaranteed the mortgage.  Doc. 976-8.  It was recorded on March 19, 2015.  Doc. 976-6. That same day, Petermark and Advill released the Montgomery Street property from the mortgage.  Doc. 439-7.  They released the East 26th Street property on August 19, 2015—after criminal proceedings had begun.  Doc. 439-6.[4]

---

[4] The Holmeses filed a quiet title action in state court in December 2015.  Doc. 978-2 ¶ 24.  That action was paused after the death of Mrs. Holmes.  *Id.*  In April 2016, Mr. Holmes filed civil rights complaints with the Department of Housing and Urban Development (HUD) against the Meiris, Alvarenga, HASNY, Launch Development, Martin Development, Petermark and Advill, and others.  *Id.* ¶ 25.  HUD issued a charge of discrimination in June 2023, finding reasonable cause to believe that the respondents had violated the Fair

### D. Criminal Proceedings

A criminal complaint was filed against Mario Alvarenga, Rajesh Maddiwar, and Amir Meiri in May 2015.  Doc. 1.  In November 2016, a superseding indictment charged those three defendants, plus Herzel Meiri, Samatha Boubert, Christine Maharaj, and Owen Reid, with various fraud and money laundering offenses, including conspiracy to commit wire fraud and bank fraud (Count One).  Doc. 159.

Herzel and Amir Meiri pled guilty to Count One of the superseding indictment in April 2018.  Doc. 300.  The Court entered a preliminary order of forfeiture as to both Meiris.  Docs. 292, 293.  They agreed to forfeit all right, title, and interest in the Fulton Street and Chauncey Street properties (and several others).  Docs. 292, 293.

Several third parties then filed petitions pursuant to 21 U.S.C. § 853(n).  The Holmeses filed a petition asserting an interest in the Chauncey Street property.  Doc. 367. Petermark and Advill did the same.  Doc. 439.  Petermark also filed a petition asserting an interest in the Fulton Street property.  Doc. 440.  Mr. Nyamekye and Nyamekye Holding did so as well.  Doc. 506.

Petermark moved for summary judgment on its Fulton Street petition, asserting that it was a bona fide encumbrancer for value.  Doc. 679.  It argued that the state court's decision in the quiet title action—which held that Petermark was a bona fide encumbrancer—bound the government in this case because the government was in privity with Nyamekye Holding.  *See United States v. Meiri*, No. 15 Cr. 627 (ER), 2021 WL 5494771, at *3 (S.D.N.Y. Nov. 23, 2021).  But the Court concluded that the government's interests were "not identical to Nyamekye's," so the two were not in privity and the government was not bound by the state court's decision.  *Id.* at *4.

On the merits, Petermark contended that it was a bona fide encumbrancer because it had no notice of the Meiris' fraud.  *See id.*  The Court rejected that argument, finding

---

Housing Act.  Doc. 978-5.  Pnini testified that he was not aware that his companies had been charged with discrimination.  Tr. 263.

that potential red flags identified by the government raised a triable issue of fact as to whether Petermark should have known of fraudulent conduct rendering the property forfeitable. *Id.* at *4–5. Petermark thus failed to establish as a matter of law that it was a bona fide encumbrancer. *Id.* at *5. The Court also concluded that summary judgment was not warranted on Petermark's alternative claim for equitable subrogation. *Id.*[5]

Petermark and Advill also moved for summary judgment on their Chauncey Street petition. Doc. 796. The Court denied that motion for similar reasons. *United States v. Meiri*, No. 15 Cr. 627 (ER), 2024 WL 342491, at *4–5 (S.D.N.Y. Jan. 30, 2024). Because the Chauncey Street transaction followed the Fulton Street transaction, the Court explained, "the same red flags that created a triable issue of fact as to the Fulton Street properties . . . also defeat summary judgment here." *Id.* at *4. And the Court again found that Petermark and Advill were not entitled to summary judgment on their alternative claim for equitable subrogation. *Id.* at *5.

On June 4 and 14, 2024, the Court held a hearing to adjudicate the parties' interests in the Fulton Street and Chauncey Street properties. Docs. 963, 965. Counsel appeared for the United States, the City of New York, Petermark (for the Fulton Street property), Petermark and Advill (for the Chauncey Street property), Mr. Nyamekye and Nyamekye Holding, and Mr. Holmes.

At the outset, the Court resolved motions in limine and evidentiary challenges. The Court denied Petermark's motion in limine (Doc. 947) to preclude Nyamekye Holding from introducing evidence challenging Petermark's status as a bona fide encumbrancer with respect to the Fulton Street property. Tr. 4. The Court also denied Mr. Holmes's motion in limine (Doc. 953) to exclude evidence of a lien by equitable subrogation. Tr. 4. Noting that both motions were premised on Federal Rule of Evidence 403, the Court found that presentation of the evidence would not unduly confuse the

---

[5] Petermark moved for reconsideration on only the privity issue. Doc. 834. The Court denied that motion as well. *United States v. Meiri*, No. 15 Cr. 627 (ER), 2024 WL 231458, at *4 (S.D.N.Y. Jan. 22, 2024).

Court or delay the proceeding. *Id.* Lastly, Petermark and Advill challenged some of Mr. Holmes's proposed exhibits. Tr. 5–6. Mr. Holmes withdrew two of the exhibits, and the Court admitted the others, concluding that they were not unduly prejudicial. Tr. 8–9.

Mr. Nyamekye and Mr. Holmes submitted their testimony by affidavit, and Petermark and Advill declined to cross-examine them. The Court heard testimony from Pnini and Guberman, as well as three expert witnesses. Theresa Garelli, Petermark's expert for the Fulton Street loan, has worked as underwriting counsel for various title insurance companies throughout her career. Tr. 103–04; *see* Doc. 983-9. Garelli testified as an expert in the field of title underwriting. Tr. 102. Kenneth Warner, Petermark and Advill's expert for the Chauncey Street loan, also works in the title insurance business as an attorney, principal, and clearance counsel. Tr. 172; *see* Doc. 977-8. Warner testified as an expert on underwriting claims and reviewing title reports. Tr. 173. Finally, David Reiss testified as an expert for Mr. Holmes. Reiss is a professor of law who teaches and researches in the areas of real estate, real estate finance, and housing policy. Tr. 289–90. He previously worked on real estate transactions in private practice. Tr. 300. The Court permitted Reiss to testify as an expert over the objections of Petermark and Advill. Tr. 303. The Court found that Reiss's experience as a practicing attorney and an academic in the field of real estate finance—including title insurance and title reports—was sufficient to allow him to testify as an expert in that area. Tr. 304.

The parties filed post-hearing briefs on August 29 and 30, 2024. Docs. 970, 971, 975, 978, 980.[6]

_____

[6] In supplemental letters, Petermark and Nyamekye Holding dispute whether Nyamekye may challenge Petermark's status as a bona fide purchaser with respect to the Fulton Street property. Docs. 984, 985, 987. According to Nyamekye Holding, the state court's decision that Petermark was a bona fide encumbrancer does not have res judicata effect because an appeal is pending and final judgment has not been entered. Doc. 985; *see* Doc. 980 at 5. But "the mere pendency of an appeal does not deprive a challenged judgment or order of its res judicata effect." *5512 OEAAJB Corp. v. Hamilton Ins. Co.*, 138 N.Y.S.3d 555, 558 (App. Div. 2020); *accord, e.g.*, *Oparaji v. Municipal Credit Union*, No. 19 Civ. 4034 (AT) (SN), 2020 WL 1155898, at *3 (S.D.N.Y. Mar. 10, 2020). In any event, the government may challenge Petermark's status as a bona fide purchaser because it is not in privity with Nyamekye Holding. And even if both Nyamekye

## II.    LEGAL STANDARD

Criminal forfeiture proceedings are governed by 21 U.S.C. § 853 and Federal Rule of Criminal Procedure 32.2.  After a conviction or guilty plea, "the court must determine what property is subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1)(A).  "If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria."  Fed. R. Crim. P. 32.2(b)(2)(A).  That order is entered "without regard to any third party's interest in the property."  *Id.*

A third party may then assert an interest in the forfeited property and "petition the court for a hearing to adjudicate the validity of his alleged interest."  21 U.S.C. § 853(n)(2).  A petitioner can demonstrate a valid interest in property subject to forfeiture by showing that either:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

*Id.* § 853(n)(6).  The petitioner must establish by a preponderance of the evidence that one of these conditions applies.  *Id.*; *see also Pacheco v. Serendensky*, 393 F.3d 348, 351 (2d Cir. 2004).

---

Holding and the government did not have standing, the burden still would be on Petermark to demonstrate bona fide purchaser status.  21 U.S.C. § 853(n)(6)(B).  As explained below, Petermark has not done so.

Focusing on the second condition, the question whether a petitioner is a bona fide purchaser is determined by reference to state law. *See Pacheco*, 393 F.3d at 353 (citing *United States v. Harris*, 246 F.3d 566, 571 (6th Cir. 2001)); *see also, e.g.*, *United States v. Mendez*, No. 07 Cr. 107 (ARR), 2009 WL 1706354, at *3 (E.D.N.Y. June 17, 2009) ("The determination of the relevant property interests, including the definition of a bona fide purchaser for value, are governed by state law."). New York law has long held:

> [W]here a purchaser of land has knowledge of any facts sufficient to put him upon inquiry as to the existence of some right or some title in conflict with that he is about to acquire, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim to be considered a bona fide purchaser.

*Anderson v. Blood*, 46 N.E. 493, 495 (N.Y. 1897). If the purchaser knows facts that would "excite the suspicion of an ordinarily prudent person and he fails to make some investigation," then the purchaser is "chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed." *Miner v. Edwards*, 634 N.Y.S.2d 306, 307 (App. Div. 1995) (quoting *Anderson*, 46 N.E. at 495). "A mortgagee who fails to make such an inquiry is not a bona fide encumbrancer for value." *Booth v. Ameriquest Mortg. Co.*, 881 N.Y.S.2d 152, 153–54 (App. Div. 2009).

Section 853(n)(6)(B) also requires a petitioner to show that it was "reasonably without cause to believe that the property was subject to forfeiture." The court must examine "not merely whether the petitioner had knowledge of the forfeitability of the asset but whether the petitioner reasonably held the belief that the property was not subject to forfeiture." *United States v. Dreier*, 952 F. Supp. 2d 582, 588 (S.D.N.Y. 2013) (quoting *United States v. King*, No. 10 Cr. 122 (JGK), 2012 WL 2261117, at *8 (S.D.N.Y. June 18, 2012)). "In appropriate circumstances, this objective test requires a petitioner 'to conduct further inquiry before seeking to obtain an interest' in property that may be subject to forfeiture." *Id.* (quoting *King*, 2012 WL 2261117, at *9); *see also United States v. Medina Cuartes*, 155 F. Supp. 2d 1338, 1343 (S.D. Fla. 2001) ("This standard

precludes 'wilful blindness' on the part of a petitioner and imposes a duty of reasonable inquiry, where warranted, before 'objective reasonableness' can be established." (citing *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 474–75 (E.D. Va. 1994))). A petitioner "may be a victim of fraud and still reasonably have cause to believe that the purchased property was subject to forfeiture—because, say, the petitioner ignored red flags or otherwise acted unreasonably in completing the deal." *United States v. Swartz Family Tr.*, 67 F.4th 505, 518 (2d Cir. 2023); *see also United States v. Coffman*, 612 F. App'x 278, 287 (6th Cir. 2015) (holding that company was not reasonably without cause to believe property was subject to forfeiture based on "red flags around [the defendant's] financial status" at time of purchase).

If the petitioner satisfies these requirements, "the court shall amend the order of forfeiture in accordance with its determination." § 853(n)(6).

## III.   DISCUSSION

### A.  Section 853(n)(6)(B)

Petermark and Advill loaned the Meiris $2.6 million over a five-month span. In doing so, Petermark and Advill ignored a host of red flags that the transactions raised. Instead of investigating further, Petermark and Advill looked the other way and avoided learning additional information about the Meiris' business or the properties securing the loans. Petermark and Advill therefore have not carried their burden under § 853(n)(6)(B) to show that they were bona fide purchasers reasonably without cause to believe the properties were subject to forfeiture.[7]

#### 1. *Red Flags*

Based on the evidence in the record, the Court finds that numerous red flags should have put Petermark and Advill on notice of the Meiris' fraud. Some of these

---

[7] The same facts that preclude bona fide purchaser status for Petermark and Advill also demonstrate that they were not reasonably without cause to believe the properties were subject to forfeiture. The Court therefore examines the "bona fide purchaser" and "reasonably without cause" requirements of § 853(n)(6)(B) together in the discussion that follows.

issues were more glaring than others, but together they should have been more than enough to raise serious questions about whether the Meiris had acquired the properties through legitimate means.

        *a.* *The HASNY Office and the Meiris' Business*

     The first red flags should have been obvious from Pnini's initial meeting with the Meiris. Pnini admitted that he visited the Meiris' Hillside Avenue office "[o]nce or twice." Tr. 217. Both the exterior and interior of that office featured prominent signage that read: "Homeowner Assistance Services of New York." Docs. 691-3, 691-4. Pnini's testimony about the signs was evasive, to say the least. He repeatedly insisted that he did not "acknowledge" the words on the signs, Tr. 217–18, and compared it to visiting his attorney's office:

> Q. So although you visited [the] Meiris, you didn't bother to see the name of the business above the door, right?
>
> A. I didn't say that. I said I didn't acknowledge it. Just like when I walk into my lawyer's office, he potentially has . . . six different lawyers on his door. And I don't acknowledge any one of them. I just go there and know where I'm going, I know the address and I walk in, most of the time oblivious to my own self.

Tr. 223. This answer itself seems to concede that Pnini saw the signs—even while declining to "acknowledge" the words—and it is hard to imagine how he could have missed them. Furthermore, the name "Homeowner Assistance Services of New York" appeared, along with its Hillside Avenue address, in both the "presenter" and "return to" fields on the deeds transferring the Fulton Street property from Nyamekye Holding to Launch. Docs. 981-6, 981-10.

     As Reiss explained—and the name itself suggests—the term "homeowner assistance" is often used by legitimate government entities and nonprofits that help distressed homeowners. Tr. 327. It would be unusual, however, for such entities to enter a UCC-1 lien on a homeowner's property or take the deed to a property. Tr. 381–82. So it should have raised a red flag for Petermark that the Meiris' network of organizations

had done those things while claiming to provide "homeowner assistance services." *See* Tr. 328–29. And it should have been curious to Pnini—an experienced hard money lender—that his counterparts at Launch were advertising help for homeowners.

b.  *No Consideration Transfers*

The no consideration transfers of the Fulton Street property presented another bright red flag. Recall that Mr. Nyamekye transferred the property to Nyamekye Holding in September 2010 for no consideration. Then, Nyamekye Holding purportedly conveyed the two lots—described in identical terms—to Launch for $1,000 apiece in June 2014 and August 2014.

The 2014 deeds were illogical on their face. They suggested that Nyamekye Holding had transferred the same plot of land, to the same grantee, for the same price, twice in two months. After reviewing the documents, Guberman admitted that they showed "two separate deeds purporting to cover the exact same physical location" and that it "looks like somebody had an error over there." Tr. 73. That fact alone should have raised questions for Petermark about the nature of the transfers. *See id.* (agreeing that "it would be necessary to ascertain why that occurred").

Garelli opined that the conveyance of the Fulton Street property was a single transaction rather than two separate transactions. Tr. 136, 141. She testified:

> I think that the only way to look at it is that it was done in concert. And I don't know why the deeds were done the way that they were done, but I think that the consideration applies to both. They both went to the same party, and I believe it was both subject to the same mortgage. So I think that the fact that there was two different dates is kind of irrelevant. I think that the fact is that the—from our appearances, the grantor received consideration for the conveyance of the two properties that were subject to the mortgage.

Tr. 136. The Court does not find this explanation persuasive. Garelli conceded that she had seen only "a minimal number" of transactions where multiple properties were "conveyed separately and not necessarily on the same day." Tr. 141. Despite several opportunities to do so, she could not identify a specific transaction resembling the one

that she could only speculate had taken place here.  *See* Tr. 137–38, 144–46; *see also* Tr. 136–37 ("Q.  How often do you see a party sell real estate for consideration and then sell different real estate for the same consideration that has already been paid?  A.  You don't see . . . that.  But I think you have to look at the totality of the circumstances here.").  It is hard to see how Petermark could have concluded from the deeds themselves that there was a single, legitimate transaction.  Even Garelli's statement that "I don't know why the deeds were done the way that they were done," Tr. 136, suggests that the deeds should have raised questions.  At the very least, the circumstances should have prompted Petermark to investigate.

Along with the structure of the transactions, the $1,000 value—for a multifamily property with a storefront over two lots—was suspect.  Reiss testified that no consideration and minimum consideration transfers are not common; most deals "are arms length transactions between parties that have some relationship to the market value of the property."  Tr. 331.  Garelli also noted that no consideration deeds may be used to disguise the true nature of a transaction:  "Just because someone files a no consideration deed doesn't mean that there's no consideration between the parties.  It means that people are filing false statements and not paying their taxes."  Tr. 128.  In other words, the parties are "just stating to the City of New York and the State of New York that there's no consideration."  *Id.*; *see also* Tr. 147 (Garelli agreeing that "sometimes they're lying about the consideration").  Given Petermark's experience in the industry, it should have realized that the $1,000 transfers of the Fulton Street property warranted further investigation—or, for that matter, *any* investigation.

The title company evidently agreed that the transactions were dubious, since $7,500 was placed in escrow pending the production of explanatory affidavits.  Tr. 34, 39, 62–63.  Garelli recognized that additional information was required because the "story" of title could not be told from the documents alone.  Tr. 147.  She also acknowledged that there could have been "any number" of stories, including a distressed property, a lie about

the consideration, or a transaction that was fraudulent altogether. Tr. 147–48. The affidavits, then, were necessary to clarify matters.

They failed to do so. In the first two affidavits, which apparently addressed the June and August 2014 transfers, Mr. Nyamekye stated: "I conveyed the subject premises for $1,000.00 and subject to the existing mortgages in 'as is' condition." Doc. 982-2 at 5–6 (capitalization omitted). But there was no "existing mortgage" at the time: the Manors Pride mortgage had been paid off in July 2014, almost a year before the affidavit was signed. Doc. 981-9; *see* Tr. 38–40 (Guberman agreeing that there was no "existing mortgage" and that this was an "error"); Tr. 168 (Garelli acknowledging that there were no outstanding mortgages in 2015, when the affidavit was signed).[8]

The third affidavit had more problems. Mr. Nyamekye asserted that he had conveyed 2146 Fulton Street to Launch in August 2014 for no consideration. Doc. 982 at 7. As Garelli conceded, that statement contradicted the second affidavit, which stated that 2146 Fulton Street was conveyed to Launch in August 2014 for $1,000. Tr. 157. The explanation for the transfer did not make sense either. Mr. Nyamekye stated: "I conveyed the subject premises to my corporation to change the form of ownership." Doc. 982 at 7 (capitalization omitted). Of course, Launch Development was not Mr. Nyamekye's corporation—which was evident from other documents. *Id.* at 30–35.

Petermark downplays the obvious contradictions in the affidavits. It argues that the third affidavit "could only reference" the September 2010 no consideration transfer from Mr. Nyamekye to Nyamekye Holding. Doc. 970 at 14. But if the affidavit was supposed to address that transfer, it was incorrect as to both the date and the grantee, as Garelli acknowledged. Tr. 157. According to Petermark, "it seems plausible" that the incorrect reference to Launch in the third affidavit "was copied from the prior affidavit

---

[8] Petermark observes that the Manors Pride mortgage was satisfied in September 2014, so there "was a mortgage on the Fulton Street Premises as of the dates of the *conveyances*." Doc. 970 at 12 n.11 (emphasis added). But the point is that there was no mortgage on the Fulton Street property as of the dates of the *affidavits*, rendering their references to an "existing mortgage" inaccurate—or at least ambiguous.

and only partially modified." Doc. 970 at 14 n.13. This post hoc conjecture is insufficient to show that Petermark was a bona fide purchaser reasonably without cause to believe the property was subject to forfeiture. Petermark offers no evidence to suggest that it took any steps at the time of the transaction to determine which transfers each affidavit referred to or why they were riddled with discrepancies. Given the circumstances, it was unreasonable for Petermark to ignore the glaring inconsistencies both in the deeds themselves and in the late-arriving affidavits.

       *c. UCC-1 Statements*

       Petermark also failed to investigate the UCC-1 fixture filings encumbering the East 26th Street property that partially secured the Chauncey Street loan. As explained above, a fixture filing secures a lender's interest in items that are attached to the property. *See* Tr. 316. The title report indicated that Launch Development had filed two UCC-1 statements on the East 26th Street property in March 2013. Doc. 979-6 at 10; *see* Doc. 979-3. Those filings used the same broad language to describe the collateral. Doc. 979-3 at 5, 10. UCC-3 statements terminating the fixture filings were not filed until after the Chauncey Street loan closed. Doc. 979-4.

       The UCC-1 filings should have raised additional questions. Instead of identifying specific fixtures, which is how a legitimate contractor would use a UCC-1 filing, Tr. 316, they described the collateral in sweeping terms. Even more suspect, the UCC-1 liens had been placed on the East 26th Street property by Launch Development in March 2013. UUA, LLC—another Meiri entity—then acquired title to the property in July 2014. Doc. 979-6 at 6. Reiss testified that seeing a buyer place a UCC-1 lien on a property before purchase would be "incredibly rare, and would not be a red flag, but be like a three-alarm fire." Tr. 316–17. While there could be some legitimate reason for such a UCC-1 filing, Reiss explained: "It's definitely going to make me ask a lot of questions, like what's the relationship between the buyer and the seller that the buyer recorded this on the property prior to the purchase. It's just shocking to me." Tr. 320. In short, the UCC-1 liens on the

24

property were "[b]igger than a red flag." Tr. 318. Even Warner (Petermark and Advill's expert), though he did not view the liens as indicative of fraud, conceded that these circumstances were "somewhat unusual" and that "you don't see it every day." Tr. 192–93. At the very least, then, Petermark should have questioned the Meiris about the UCC-1 liens—especially since Pnini stressed that he would not make a loan on a property unless he had first lien position, Tr. 246–49, 253. *See also* Tr. 318 (Reiss stating that a lender "would definitely need to inquire" about an outstanding UCC-1 lien at the time of a loan); *cf. United States v. Orozco-Prada*, 636 F. Supp. 1537, 1544 (S.D.N.Y. 1986) (holding that outstanding mechanics' liens on property "demanded some inquiry" and "should have alerted [one purchaser] that something was amiss").

In Petermark's view, the UCC-1 liens were unremarkable because it was UUA, not Launch Development, that bought the East 26th Street property after Launch filed the liens. Doc. 970 at 15–16 & n.15; *see* Tr. 348–49. Petermark appears to be suggesting that, for all Pnini knew, the filer of the UCC-1 liens and the owner of the property were two unrelated entities. But Pnini would have been aware that the Meiris were connected to both UUA and Launch. The Meiris first approached him about the February 2015 Fulton Street transaction (in which Petermark loaned $700,000 to Launch) and then approached him about the March 2015 Chauncey Street transaction (in which Petermark and Advill loaned $800,000 to UUA, Horatio Management, and Martin Development). Documents in the title report also linked HASNY's Hillside Avenue address, which Pnini had visited, to Launch, Horatio Management, and Alvarenga. Doc. 979-6 at 24, 28; *see* Tr. 200–01. So the fact that UUA—rather than Launch itself—purchased the property after Launch filed the UCC-1 liens does not make those filings any less of a red flag.[9]

---

[9] As noted above, when Pnini conducted his first transaction with the Meiris—the October 2014 loan—one of the properties was likewise encumbered by a UCC-1 lien filed by Launch. Doc. 979-1. That filing was not terminated until December 2015, Doc. 979-2, and should have raised red flags for similar reasons. *See* Tr. 323 (Reiss explaining that he "would want to inquire" into the "pattern of closing loans with outstanding UCC-1s").

### d.  Other Red Flags

Other irregularities should have triggered Petermark and Advill's suspicions as well.  For one, there were numerous outstanding property charges and violations related to the relevant properties.  With respect to the Fulton Street property, more than $90,000 was placed in escrow to cover Environmental Control Board violations, unpaid taxes, water and sewer charges, and a sidewalk lien.  Doc. 982-2 at 1; *see* Tr. 160.  Similarly, the title report prepared for the Chauncey Street loan revealed several outstanding charges across the three properties, including prior judgments, Environmental Control Board violations, and a sidewalk lien.  Doc. 979-6 at 10; *see* Tr. 324–25.  Reiss testified that these outstanding charges raised "lots of questions."  Tr. 325.  But not for Pnini.  He viewed the charges as "irrelevant" since they would be deducted from the borrower's proceeds at closing.  Tr. 234–35.  In other words, Pnini was content to ignore the charges because they did not affect his bottom line.

Pnini also testified that he would not "rely on" the presence of tenants or squatters in a property when making a loan.  Tr. 236.  He did not recall whether he visited the Chauncey Street property before closing.  Tr. 239.  Nor did he remember whether he asked the Meiris if the property was occupied, *id.*—which, in fact, it was.  The title report did include an exception, which was omitted, for "[r]ights of tenants or parties in possession, if any."  Doc. 979-6 at 9.  As Reiss explained, such an omission typically would be accompanied by an affidavit stating that no one has possessory rights in the property.  Tr. 312.  No affidavit was provided here, raising yet another red flag.  Tr. 313 ("At a minimum to me, it's a question.  It's a red flag, like why was there no affidavit to this effect.  I would want to know the basis for the omit."); *cf. Orozco-Prada*, 636 F. Supp. at 1544 ("Despite [one purchaser's] cavalier attitude, this open and visible possession by third persons placed [the purchasers] on constructive notice of the possible existence of prior rights of others.").

Finally, the Meiris were able to acquire the Fulton Street property for significantly less than the price at which Pnini valued it. Pnini testified that he would not make a loan where the collateral was worth less than the value of the loan that it was securing. Tr. 268–69. Since the Fulton Street property secured a $700,000 loan, Pnini must have valued the property at more than $700,000. But Launch had acquired the property in two minimum consideration transfers for $1,000 each, Docs. 981-6, 981-10, and paid $472,156.97 to satisfy the Manors Pride mortgage, Doc. 981-9. That discrepancy should have raised one more red flag for Petermark to investigate. *See* Tr. 329–30 (Reiss explaining that "discounted acquisitions" would be a red flag for a lender).[10]

\*    \*    \*

While the Court has discussed each of these red flags independently, it is worth emphasizing that Petermark and Advill should have been aware of all of them. When considered in totality, the red flags are even more overwhelming. There were certainly enough question marks at the time Petermark made the Fulton Street loan to "excite the suspicions of an ordinarily prudent person." And when Petermark and Advill subsequently made the Chauncey Street loan, they had all the same information plus additional red flags specific to that deal.

### 2.  *Petermark and Advill's Efforts*

Measured against all these red flags, Petermark and Advill's due diligence efforts were woefully insufficient. In the context of a bona fide purchaser claim, "[t]he intended purchaser must be presumed to have investigated the title, and to have examined every deed or instrument properly recorded, and to have known every fact disclosed or to which an inquiry suggested by the record would have led." *Fairmont Funding, Ltd. v. Stefansky*, 754 N.Y.S.2d 54, 56 (App. Div. 2003). "If the purchaser fails to use due

---

[10] Garelli and Pnini suggested that the value of the transaction, including the mortgage and the outstanding taxes and violations, might have been as much as $500,000 or $600,000. Tr. 127, 258. Even those figures would still be lower than the minimum value of $700,000 that Pnini must have ascribed to the property based on his own testimony.

diligence in examining the title, he or she is chargeable, as a matter of law, with notice of the facts which a proper inquiry would have disclosed." *436 Franklin Realty, LLC v. U.S. Bank Nat'l Ass'n*, 137 N.Y.S.3d 88, 90 (App. Div. 2020) (citation omitted); *see also King*, 2012 WL 2261117, at *9 (dismissing third-party forfeiture petition where "the information known by [the third party] was sufficient to indicate to him the need to conduct further inquiry before seeking to obtain an interest in the Settlement Funds"). Petermark and Advill have not shown that they came anywhere close to satisfying their due diligence obligations.

Consider the title reports.  Pnini testified that he did not read the reports and "wouldn't even know where to start."  Tr. 213.  Instead, as Pnini repeatedly stated, he relied on his attorneys to review the documents in the report and ensure clear title.  Tr. 213, 224, 272.  Those attorneys did not testify at the hearing, but Pnini's testimony suggests that they read the reports, Tr. 272—meaning that they were aware of the numerous red flags discussed above.  So even if Pnini himself did not examine the reports, he and his companies are still charged with knowledge of the red flags they contained.  *See In re Bean*, 251 B.R. 196, 202 (E.D.N.Y. 2000) ("Although the purchasers claim that they never read the title report, they are nonetheless charged with knowledge of its contents since an attorney's actual or constructive knowledge is imputed to the client.").

Aside from the issue of who reviewed the title reports, Petermark and Advill suggest that the reports themselves demonstrate that the companies had no knowledge— actual or constructive—of fraud.  Doc. 970 at 10–11; Doc. 975 at 18; *see also* Tr. 18–19, 23.  This argument places far too much weight on the issuance of the title reports.  As another court in this District explained, "although a title report may demonstrate a grantee's actual knowledge of the facts contained therein, it is not dispositive of the grantee's constructive or inquiry knowledge about an earlier conveyance.  A person must use ordinary thoughtfulness and make accessible inquiries." *Orozco-Prada*, 636 F. Supp.

at 1543.  That is consistent with Reiss's testimony on cross-examination that a lender's due diligence obligations are not fulfilled just because the title insurance company omits exceptions and issues a policy.  Tr. 370–71; *see also* Tr. 333.  He explained:  "[Y]ou're conflating the standard that the title company needs to issue a policy and earn their premium with what inquiry notice a lender is on to be a bona fide encumbrancer for value.  They're two different inquiries."  Tr. 370; *see also* Tr. 371 (asserting that a lender's inquiry notice "doesn't disappear just because the title company took a risk in issuing this title policy to earn their premium"); *cf. In re Thakur*, 498 B.R. 410, 424–25 (S.D.N.Y. 2013) (rejecting the argument that the issuance of a title policy in favor of the lender constitutes prima facie evidence of the validity of a mortgage and eliminates any duty of further inquiry).[11]

It follows that a title report would "absolutely not" tell a lender everything it wanted to know about a transaction.  Tr. 307.  Instead, a reasonable lender would consider many other factors such as the use of the property, the presence of occupants, rent obligations, environmental conditions, cash flow, leases, the creditworthiness of the borrower, property valuation data, and public records.  Tr. 308–09; *cf. Boresek v. U.S. Dep't of Agric.*, 109 F. Supp. 3d 1338, 1345 (D. Or. 2015) (where hard money lender failed to investigate borrowers' income, tax returns, cash flow, financial statements, credit reports, and professional appraisals, court concluded that it was "doubtful" whether lender had satisfied "the duty of care with respect to the collateral for an ordinary lender,

---

[11] In the negligence context, the Appellate Division has recognized that "lenders and buyers alike customarily rely on a title insurer's title search, which enables them to decide whether to cure the defect and conclude the transaction or proceed no further."  *Citibank, N.A. v. Chicago Title Ins. Co.*, 632 N.Y.S.2d 779, 783 (App. Div. 1995).  But that fact "does not, absent some other commitment from the insurer, render the search an independent representation as to title, which survives delivery of the policy and gives rise to a cause of action in negligence or misrepresentation."  *Id.*  Instead, "[w]hat the search does, depending on the schedule of exceptions that survive the policy's issuance, is define the scope of coverage with respect to known defects."  *Id.*  As another New York court put it, "a title report is issued for the benefit of the title company, not necessarily for the party who ordered the title search."  *Zev Cohen, LLC v. Fidelity Nat'l Title Ins. Co.*, 831 N.Y.S.2d 689, 694 (Sup. Ct. 2007); *see also* Tr. 153 (Garelli stating that a title insurance company "is not required under the law to conduct a title search.  We do the title examination to protect our interest because we make the determination as to what risks we are going to assume").

much less a hard money lender whose entire investment depends on the value and security of the collateral"). And it is especially important that a lender account for these factors when lending against "distressed" properties such as the ones at issue here. Tr. 294. *See generally* Tr. 108, 116 (explaining that foreclosures, unpaid taxes, building violations, and relocation liens "all are indicative of distressed properties").

Pnini considered none of those things. His testimony revealed a striking degree of indifference toward several features of the properties that were securing his loans. Pnini did not investigate Launch's assets, did not investigate how Launch obtained the properties, did not review public records related to the properties, and did not review prior sale prices. Tr. 228–29, 232–33, 255–58. With respect to the Fulton Street property, Pnini's "research" involved searching the internet and driving by the property to "establish[] that I felt that the value was there." Tr. 208. As for the Chauncey Street property, all Pnini could offer was that "I must have done some form of due diligence to create a value in my own business mind." Tr. 239.

To compound the problem, Pnini did essentially no research on the Meiris before loaning them a total of $2.6 million over three transactions. He did not conduct a credit report or inquire into the nature of their business. Tr. 220, 223–24. At the hearing, Pnini vacillated on the subject of what questions he asks before making a loan. *Compare* Tr. 220 ("Q. Do you find out what kind of business that they're in? A. No."), *with id.* ("Q. Do you ask them what the purpose of the money is going to be used for? A. I would say sometimes I do, yes."). But he made clear that how the Meiris were using the money he loaned them was "an irrelevant concept." *Id.*; *see also* Tr. 224–25.[12] Pnini did not "use ordinary thoughtfulness" or "make accessible inquiries." *Orozco-Prada*, 636 F. Supp. at

---

[12] Pnini then retreated from this assertion to some degree, stating that it "would be a different story" if he learned that the recipient of a loan was engaged in criminal activity. Tr. 220; *see also* Tr. 225 (asserting that it "would bother me" if the borrower were "a criminal"). But he did not describe having taken any steps to investigate whether the Meiris were involved in criminal activity.

1543. Instead, he apparently went out of his way to avoid learning important information about the properties and the borrowers.

*Orozco-Prada* is instructive. There, two purchasers relied on a title insurance report to argue that they did not have actual knowledge of an earlier conveyance. *Id.* Rejecting their bona fide purchaser claim, the court explained that the purchasers' "steadfast reliance on the title report is misplaced, since they failed to inquire into any of the warning flags raised in either the title report or the open possession of the property." *Id.* at 1545. The court concluded that "[the purchasers'] ostrich-like behavior will not permit them to prevail in this action." *Id.* The same is true here. Petermark and Advill failed to investigate the numerous red flags raised in the title reports; they cannot claim bona fide purchaser status based on the mere fact that the title company was willing to issue the policies. *See also Bouffard v. Befese, LLC*, 976 N.Y.S.2d 510, 515 (App. Div. 2013) (affirming trial court's conclusion that, based in part on irregularities in title report, a reasonably prudent purchaser "would have made further inquiry").

Petermark overemphasizes the Patriot search that Knickerbocker ran on Launch Development, which revealed that Launch was not on the Treasury Department's list of "designated nationals and blocked persons." Doc. 982-3 at 12 (capitalization omitted); *see* Doc. 970 at 13–14. A Patriot search might be part of a lender's due diligence, but it is hardly a panacea that automatically entitles a lender to bona fide purchaser status. In fact, this case illustrates the limitations of a Patriot search as a means of due diligence. Knickerbocker's search did not return any results for Launch, even though the Meiris were using that entity to defraud vulnerable individuals out of their homes. Petermark cannot hide behind the results of the Patriot search when it disregarded other red flags in the title reports.

Petermark tries another angle as well, arguing that "further inquiry" would not have revealed any evidence of fraud. Doc. 970 at 13–14, 16. For example, Petermark insists that the no consideration affidavits were "the best and possibly the only

investigation that could be done of the two no consideration deeds." *Id.* at 13; *see also id.* (asserting that "further inquiry concerning these two deeds . . . could not have been undertaken"). Petermark and Advill also maintain that asking questions about any red flags would have been fruitless because the Meiris would not have volunteered evidence of criminal activity. *Id.* at 16–17; Doc. 975 at 16–17.

These arguments are meritless. Most obviously, Petermark could have—and, given the inconsistencies in the affidavits, should have—investigated further by contacting the affiant, Mr. Nyamekye. A conversation with Mr. Nyamekye about the contents of the affidavits and the nature of the transfers to Launch almost certainly would have exposed the underlying fraud. Petermark also could have inquired into the nature of the Meiris' business, which likely would have revealed that HASNY was fraudulently advertising "homeowner assistance services." And Petermark could have questioned the Meiris about other red flags such as the broadly worded UCC-1 liens filed by Launch. No one suggests that the Meiris would have openly admitted to fraud, but if they did not have a sufficient explanation for those liens—and Reiss testified that he would be hard-pressed to imagine one, Tr. 318—that would have been one more reason for Petermark to reconsider doing business with them. Petermark did not ask any of these questions, choosing instead to bury its head in the sand and proceed with the transactions despite the abundance of red flags. *Cf. United States v. Frykholm*, 362 F.3d 413, 416 (7th Cir. 2004) ("A person who has this much knowledge, and then averts his eyes lest he learn more, has actual knowledge via the ostrich inference often used in criminal prosecutions.").

At bottom, Pnini's testimony suggested that he relied on little more than gut instinct in deciding whether to close the loans with the Meiris. Perhaps, as the government posits, Pnini had no incentive to investigate further since "his business model involves taking greater risks, and making up for it with greater interest rates." Doc. 971 at 23 n.13. Within the confines of the law, Pnini is free to take whatever business risks he chooses. But those risks come with potential consequences—and the consequence here is

that his companies were not bona fide purchasers reasonably without cause to believe the properties were subject to forfeiture.

### B. Equitable Subrogation

Petermark and Advill raise an alternative argument with respect to both the Fulton Street and Chauncey Street properties.  Even if they were not bona fide purchasers under § 853(n)(6)(B), the companies argue, they are still entitled to equitable subrogation.  Doc. 970 at 18; Doc. 975 at 20.

"Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant." *JPMorgan Chase Bank v. Cook*, 318 F. Supp. 2d 159, 165 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  The doctrine of equitable subrogation applies where one party's property "is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred." *US Bank Nat'l Ass'n v. Juliano*, 125 N.Y.S.3d 126, 129 (App. Div. 2020) (quoting *King v. Pelkofski*, 229 N.E.2d 435, 439 (N.Y. 1967)).  In that event, the first party "is entitled to be subrogated to the position of the obligee or lien-holder." *Id.* (quoting *King*, 229 N.E.2d at 439).

There are two preliminary issues that the Court ultimately does not need to resolve.  First, it is not clear that equitable subrogation is available under § 853(n)(6). The statute describes two avenues that a third-party petitioner may use to assert an interest in property subject to forfeiture:  (A) the petitioner demonstrates a legal right in the property that was vested in the petitioner rather than the defendant or was superior to any right of the defendant at the time of the acts giving rise to forfeiture, or (B) the petitioner demonstrates that it was a bona fide purchaser reasonably without cause to believe that the property was subject to forfeiture.  § 853(n)(6).  Petermark and Advill do not cite any cases in which a federal court has awarded equitable subrogation in an

ancillary forfeiture proceeding. Because their arguments fail on other grounds, however, the Court will assume without deciding that equitable subrogation is available in this procedural posture.

Second, the government contends that Petermark and Advill are not entitled to equitable subrogation because "they were on notice of the fraud." Doc. 971 at 28 n.15; *see also id.* at 17 (asserting that the question whether a party is entitled to equitable subrogation is "practically identical" to the question whether it was a bona fide purchaser reasonably without cause to believe the property was subject to forfeiture). But while actual notice of an intervening interest precludes equitable subrogation, constructive notice does not. *See, e.g.*, *Green Tree Servicing, LLC v. Feller*, 74 N.Y.S.3d 365, 369 (App. Div. 2018) ("Equitable subrogation remains available even where the subrogee possesses constructive knowledge of the intervening interest, but actual notice of such interest bars application of the doctrine."). Courts have awarded equitable subrogation even where a party "was charged with knowledge of information which would have caused a prudent lender to inquire as to the circumstances of the transaction," so long as there is no indication that the party "had actual notice of the fraud or that it did anything to actively facilitate the fraud." *Lucia v. Goldman*, 44 N.Y.S.3d 89, 91 (App. Div. 2016). The Court need not decide whether Petermark and Advill had actual notice of the fraud or actively facilitated it; they are not entitled to equitable subrogation for the other reasons to which the Court now turns.

Petermark and Advill rely on the same theory of equitable subrogation for both the Fulton Street and Chauncey Street properties. The Meiris—through Launch Development—stole the Fulton Street property from the Nyamekyes in June and August 2014. In July 2014, Launch paid $472,156.97 to satisfy the Manors Pride mortgage on the property. Doc. 981-9. Then, in the February 2015 transaction, Launch granted Petermark a mortgage on any right, title, or interest Launch had in the property. Doc. 981-12 at 3. Petermark contends that Launch would have been entitled to equitable

subrogation "in the amount paid to satisfy the mortgage plus interest."  Doc. 970 at 19.
So Petermark, the argument goes, should in turn be able to equitably subrogate to the
same position that Launch would have had in the Manors Pride mortgage.  *Id.*  Otherwise,
in Petermark's view, Nyamekye Holding would be unjustly enriched by the return of the
Fulton Street property "free and clear of all encumbrances."  *Id.*[13]

Petermark and Advill follow that reasoning with respect to the Chauncey Street
property as well.  The Meiris—this time through Martin Development—stole that
property from the Holmeses on September 12, 2014.  Doc. 976-1.  After the theft, on
September 15, 2014, Martin Development paid $300,732.78 to satisfy the outstanding
Beneficial mortgage.  Doc. 978-2 ¶ 15; *see* Doc. 976-4.  Then, in the March 2015
transaction, Martin Development granted Petermark and Advill a mortgage on any right,
title, or interest Martin Development had in the property.  Doc. 976-6 at 5.  Petermark and
Advill assert that they are entitled to equitably subrogate to the position that Martin
Development would have had in the Beneficial mortgage.  Doc. 975 at 24.

To see the flaw in Petermark and Advill's argument, it is important to understand
how equitable subrogation works.  *Green Tree* provides a helpful illustration.  Nancy
Ruth Feller and Bruce Feller executed a note in favor of Option One Mortgage
Corporation that secured a mortgage against real property that the Fellers jointly owned.
*Green Tree*, 74 N.Y.S.3d at 367.  Bruce Feller later executed a second mortgage on the
same property in favor of Countrywide Bank.  *Id.*  Some of the proceeds from the
Countrywide loan were used to satisfy the Option One mortgage.  *Id.*  Countrywide
subsequently brought a foreclosure action against both Fellers and sought to add a claim
for equitable subrogation.  *Id.*  The court explained that Countrywide had provided funds
through the second mortgage to satisfy the first mortgage, which secured a loan that the

---

[13] Petermark also asserts that it should be equitably subrogated to "the satisfied lien positions of $90,900
plus interest," which represents the "borrower's charges" paid to Knickerbocker at closing to satisfy unpaid
taxes and liens.  Doc. 970 at 19; *see* Doc. 982-2 at 1.

Fellers were obligated to pay.  *Id.* at 369.  If equitable subrogation were not applied, the court reasoned, the Fellers would be unjustly enriched because they would have the first mortgage satisfied while maintaining a superior right to the property—even though Countrywide provided the funds that extinguished the first mortgage.  *Id.*  Countrywide (more precisely, Countrywide's successor in interest) was therefore permitted to assert a cause of action for equitable subrogation.  *Id.* at 370.

Petermark and Advill are not in a comparable position.  For both properties, the Meiris paid off the relevant mortgage several months *before* using the property as collateral in a transaction with Petermark and Advill.  They paid off the Fulton Street mortgage in July 2014 and the Chauncey Street mortgage in September 2014.  Pnini did not even meet the Meiris until October 2014.  Tr. 204.  So when Petermark and Advill made their loans to the Meiris in February and March 2015, they could not have provided any funds to extinguish a prior mortgage; the mortgages had already been satisfied.  Under these circumstances, Petermark and Advill are not entitled to equitable subrogation.  *Cf. US Bank*, 125 N.Y.S.3d at 129 ("JPMorgan failed to establish, prima facie, that the WaMu mortgage should be equitably subrogated to the rights of the People's United mortgage, as the People's United mortgage was not yet in existence at the time the funds from the WaMu loan were purportedly used to extinguish the Greenpoint mortgage.").

The New York cases cited by Petermark are inapposite.  Doc. 970 at 20.  Unlike Petermark and Advill, the party seeking equitable subrogation in each case had paid off a prior mortgage.  *See Filan v. Dellaria*, 43 N.Y.S.3d 353, 359 (App. Div. 2016) ("MortgageIT's submissions demonstrated that a portion of the proceeds of the MortgageIT loan was used to pay off Option One's mortgage, which was in the first priority lien position."); *Harris v. Thompson*, 985 N.Y.S.2d 713, 715 (App. Div. 2014) ("[I]t is undisputed that the plaintiff gave two valid mortgages to Emigrant, and AmTrust submitted documentary evidence to prove that a portion of the proceeds of its loan to

Leslie had satisfied the Emigrant mortgages."); *Fed. Nat'l Mortg. Ass'n v. Woodbury*, 679 N.Y.S.2d 116, 117 (App. Div. 1998) ("Even if, as appellant contends, her signature on the subject mortgage was forged, partial summary judgment was properly granted to plaintiff on the theory of equitable subrogation, based on its pay off of prior mortgages against appellant's property at the closing of the subject mortgage.").

Attempting to avoid this conclusion, Petermark and Advill suggest that they may equitably subrogate by standing in the shoes of Launch and Martin Development.  To be sure, the Meiri entities did extinguish their victims' prior mortgages.  But Petermark and Advill's argument rests on the erroneous premise that Launch and Martin Development would have been entitled to equitable subrogation after paying off those mortgages.  *See* Doc. 970 at 19; Doc. 975 at 24.  Under New York law, equitable subrogation is not available to a party that participated in forgery or fraud.  *See Crispino v. Greenpoint Mortg. Corp.*, 758 N.Y.S.2d 367, 369 (App. Div. 2003) (concluding that doctrine of unclean hands barred equitable subrogation for party that participated in forgery of deed); *Cathay Bank v. Bonilla*, No. 17 Civ. 3551 (NG) (SIL), 2023 WL 6812274, at *21 (E.D.N.Y. Oct. 16, 2023) (holding that equitable subrogation was not available to party that actively facilitated fraudulent transfer), *appeal filed*, No. 23-7812 (2d Cir. Nov. 20, 2023); *cf. Kleeger v. Kleeger*, 688 N.Y.S.2d 921, 921 (App. Div. 1999) ("The appellant is barred by the doctrine of unclean hands from seeking the equitable remedy of recovering money obtained through unjust enrichment.").  In this case, Launch and Martin Development would not have been entitled to equitable subrogation because they stole the properties in question from the Nyamekyes and the Holmeses.  Petermark and Advill cannot stand in the shoes of parties that themselves had no right to equitably subrogate.  *See Crispino*, 758 N.Y.S.2d at 369 (holding that assignee of mortgage was not entitled to equitable subrogation because it was subject to same defenses, including doctrine of unclean hands, as assignor who participated in forgery of deed).

The unreported trial court decision that Petermark and Advill rely on does not compel a different conclusion. Doc. 970 at 20–22; Doc. 975 at 22–23 (both citing *Johnson v. Melnikoff*, 873 N.Y.S.2d 234, 2008 WL 4182397 (Sup. Ct. 2008)). In that case, as relevant here, the Bank of New York Trust Company (BNY) sought equitable subrogation as assignee of First National Bank of Arizona (FNBA). *Johnson*, 2008 WL 4182397, at *8. The FNBA mortgage was void because it was based on a fraudulently obtained deed. *Id.* The plaintiff argued that the doctrine of unclean hands barred BNY from receiving equitable relief. *Id.* But the court rejected that argument because there was "no allegation that either BNY or FNBA in any way participated in the alleged fraud perpetrated on [the plaintiff]." *Id.* Here, by contrast, Launch and Martin Development did not just participate in the fraud—they orchestrated it.

*    *    *

Petermark and Advill were not bona fide purchasers for purposes of § 853(n)(6)(B), and they are not entitled to equitable subrogation. Their petitions are denied with respect to both properties.

### C. The Nyamekye and Holmes Petitions

As noted above, Mr. Nyamekye and Nyamekye Holding filed a petition asserting an interest in the Fulton Street property. Doc. 506. The Holmeses filed a petition asserting an interest in the Chauncey Street property. Doc. 367.

The court must amend the forfeiture order if a third-party petitioner establishes a legal right, title, or interest in the property that "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." § 853(n)(6)(A). In this case, no one has disputed—and the record makes clear—that title to the properties was vested in the Nyamekyes and the Holmeses at the time of the fraudulent acts that gave rise to forfeiture. Accordingly, their petitions are granted.

## IV.    CONCLUSION

For the foregoing reasons, the Petermark and Advill petitions, Docs. 439, 440, are DENIED.  Mr. Nyamekye and Nyamekye Holding's petition, Doc. 506, is GRANTED. Mr. Holmes's petition, Doc. 367, is GRANTED.  The parties are directed to meet and confer and submit proposed final orders of forfeiture for the Fulton Street and Chauncey Street properties by October 24, 2024.

The Clerk of Court is respectfully directed to terminate Docs. 947, 953, 954, 956, 978, and 979.

It is SO ORDERED.

Dated:    October 17, 2024
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.